## APPEAL OF LINCOLN L. McCANDLESS.

Docket No. 2783.    Promulgated January 20, 1927.

1. Amounts paid for surveys of land involved in litigation *held* to be capital expenditures.

2. Upon the evidence, *held*, that the transaction upon which the taxpayer sought to deduct a loss did not constitute a sale, and that the Commissioner properly added a penalty of 50 per centum of the total amount of the deficiency resulting from the disallowance of the deduction sought by the taxpayer.

*Urban E. Wild, Esq., Arthur S. Hoppe, Esq.,* and *E. R. Cameron, C. P. A.,* for the petitioner.

*A. Calder Mackay, Esq., Ward Loveless, Esq., John D. Foley, Esq.,* and *W. Frank Gibbs, Esq.,* for the Commissioner.

This appeal is from the determination of a deficiency in income tax for the year 1921 in the amount of $6,010.96 and a fraud penalty in the additional amount of $3,005.48. The taxpayer asserts that the Commissioner erred in the following particulars: (1) In disallowing a deduction of $524.75 paid in 1921 for surveys of land upon which suit in partition was pending; (2) in disallowing a deduction of $133.25 paid in 1921 for surveys of land in an endeavor to quiet title; (3) in disallowing a deduction of $42,500 which the taxpayer claimed as a loss suffered on the sale of shares of stock sold during the year 1921; and (4) in determining a fraud penalty against the taxpayer.

### FINDINGS OF FACT.

1. The taxpayer is a citizen of the United States and a resident of Honolulu, T. H.

2. In 1921 and for several years prior thereto the taxpayer and one James Armstrong owned certain lands at Pearl City, Oahu, T. H., as tenants in common. Armstrong brought an action against the taxpayer in 1921 for the partition of these lands. After this action was brought, the taxpayer employed a surveyor to make a survey of the lands in an effort to determine whether the lands could be divided in kind between the parties. The taxpayer paid the surveyor $524.75 in 1921 and sought to deduct the same in his income-tax return for that year as an ordinary and necessary business expense. This deduction was disallowed by the Commissioner. The suit in partition was terminated by Armstrong purchasing the taxpayer's interest in the lands. A part of the taxpayer's business enterprises in 1921 was the purchase, sale, and renting of real estate.

3. For a number of years prior to 1921, the taxpayer claimed title to certain lands at Waiele, T. H., known as " Waimalu Lands." The

Territory also claimed title to the lands and brought suit in the Territorial Land Court for registration of its claimed title. As the issues involved boundary lines, the taxpayer caused a survey of the lands to be made and brought suit to register his title, in order to protect his own interests. The taxpayer paid $133.25 for these surveys in 1921 and claimed that amount as a deduction in his income-tax return for that year as an ordinary and necessary business expense. This deduction was disallowed by the Commissioner. The two suits for registration of title are still undetermined.

4. The California-Hawaiian Development Co. is a corporation which was organized under the laws of the State of California on or about September 27, 1911. This company, hereinafter called the corporation, was organized by the taxpayer and several associates, among whom was C. G. Bockus, for the purpose of acquiring from the Sierra Nevada Development Co., an Arizona corporation, certain mining properties in Placer County, California. The corporation was incorporated with a capital stock of 3,000,000 shares having a par value of one dollar each. Sometime in 1909 the taxpayer had purchased shares of stock in the Sierra Nevada Development Co. at the price of $7.50 for shares having a par value of $10 each. These shares were exchanged in 1911 for shares of stock in the corporation at the ratio of one for twenty.

5. C. G. Bockus was a resident of Honolulu for many years prior to March, 1922, when he left Honolulu for San Francisco, Calif., where he has since continued to reside. He had been one of the organizers and for some time secretary of the corporation, and was a licensed dealer in stocks, bonds, and general securities in the Territory of Hawaii during the year in question. He was on terms of intimate friendship and association with the taxpayer and had many business dealings in the sale and purchase of stocks and bonds for him.

6. On or about December 10, 1921, Bockus called at the office of the taxpayer in Honolulu and offered to purchase some of his stock in the corporation at 5 cents per share. At that time the taxpayer told Bockus that he would consider the matter. Subsequently, and on December 15, 1921, Bockus again called on the taxpayer and renewed his offer. On that date the taxpayer informed Bockus that he would sell him 100,000 shares of the stock of the corporation. The taxpayer then produced certificate 184 for 280,800 shares of the stock of the corporation and endorsed and delivered it to Bockus. This was done with the understanding that Bockus was to surrender the certificate for cancellation and have two certificates issued in lieu thereof; one to himself for 100,000 shares and the other to the taxpayer for 180,800 shares. At that time Bockus gave the taxpayer a

receipt for the certificate for 280,800 shares, on which he wrote "of which 100,000 shares is sold to me at five cents per share, balance to be returned." At the same time the taxpayer made a memorandum as follows:

Dec. 15/21

Sold to C. G. Bockus 100,000 shares at 5¢ of C. H. D. Co. Stock out of

| | |
|---|---:|
| Certificate #184 of _____ | 280, 800 |
| Sold _____ | 100, 000 |
| Due L. L. McC_____ | 180, 800 |

This stock cost $37.50 Per Share. Paid 8 assessments
2 at 2¢

| | |
|---|---:|
| 6 at 1¢ total 10 cts. Per share or_____ | 3, 750 |
| | 1, 000 |
| Total cost per share_____ | 4, 750 |

Bockus mailed certificate 184 to the office of the corporation in San Francisco for surrender and transfer on or about December 22, 1921. The certificate was canceled by the secretary of the corporation on December 30, 1921. In lieu thereof, certificate 697 for 100,000 shares was issued to Bockus, and certificate 698 for 180,800 shares was issued to the taxpayer. Both certificates were mailed to Bockus. He retained certificate 697 and delivered certificate 698 to the taxpayer. On December 15, at the time of the purported sale, Bockus told the taxpayer that he would give his note in payment for the stock. The taxpayer assented to this and Bockus then made out and delivered to him a promissory note or I O U in the amount of $5,000. This transaction, which the taxpayer claims was a sale, was made because he desired to sustain a loss for the purpose of deducting the amount thereof from his income in his tax return for the year 1921.

7. The shares of stock transferred by the taxpayer to Bockus were acquired by him December 30, 1911, in exchange for the shares of stock of the Sierra Nevada Development Co. which he owned. At the ratio of exchange, the cost to the taxpayer of the shares in the corporation was 37½ cents per share. During the period from December 26, 1914, to June 28, 1921, the taxpayer paid assessments amounting to 11 cents per share, thus making the total cost of each share 48½ cents, or $47,500 for the 100,000 shares. The fair market value of the stock on March 1, 1913, was 50 cents per share.

8. A day or two after the delivery of certificate 184 to Bockus, the taxpayer gave the receipt for the certificate which Bockus had signed at the time of the delivery and his own memorandum of the transaction to one J. S. Martin, who was his bookkeeper, for filing. At that time the taxpayer told Martin the details of the transfer of the 100,000 shares to Bockus. Martin then asked the taxpayer why he had not been given a chance to buy that stock and stated that he

would like to buy 100,000 shares at 5 cents per share and give his note in payment therefor. The taxpayer then told Martin that he would see Bockus about it. Accordingly, the taxpayer called on Bockus and told him that Martin desired to buy the 100,000 shares at 5 cents per share and give his note in payment therefor. After that conversation, Bockus called on the taxpayer and stated that he would be willing to transfer the 100,000 shares to Martin, if the taxpayer would accept Martin's note for $5,000, return to Bockus his note or I O U and also pay Bockus a broker's commission on the deal. The taxpayer assented to this offer and informed Martin on or about December 21, 1921, of Bockus' condition and stated that he would accept Martin's note. Martin immediately made out his promissory note for $5,000 payable to the taxpayer and delivered it to him. The taxpayer returned to Bockus his note or I O U for $5,000, which Bockus destroyed. Subsequently, in April, 1922, the taxpayer paid Bockus $200 on account of the brokerage agreed upon for the transfer of the shares to Martin and, in August, 1922, paid the balance of $50, taking a receipt for each payment. When certificate 697 for the 100,000 shares was received by Bockus, he endorsed it and gave it to the taxpayer for delivery to Martin. The certificate was delivered to Martin and he placed it in the safe of the office in which he was employed by the taxpayer and held it there until about the first of June, 1922, when he sent it to San Francisco for transfer to his own name. It was canceled on June 8, 1922, and certificate 702 was issued to Martin in lieu thereof. Martin paid $20 for transfer stamps on this certificate. The promissory note which Martin had given the taxpayer was kept in the safe in the office in which he was employed by the taxpayer. Martin made no entries on the taxpayer's books, either of the purported sale of the 100,000 shares of stock to Bockus or the reciept of his note or I O U for $5,000, nor did he make any entries of the promissory note given by him to the taxpayer. Neither did Martin pay any interest to the taxpayer on the promissory note which he gave.

9. Sometime in August, 1922, Martin received a notice of an assessment levied on the 100,000 shares of stock represented by certificate 702. He did not want to pay the assessment and so informed the taxpayer, who stated that, if Martin could not pay the assessment, he would take the stock back. Martin had access to the taxpayer's office safe. He took therefrom the promissory note for $5,000, which he had given the taxpayer, and destroyed it. He then endorsed and delivered certificate 702 to the taxpayer, who paid the assessment thereon. This certificate was canceled on September 21, 1922, and certificate 706 was issued to the taxpayer in lieu thereof. The taxpayer paid for the tax stamps on this last transfer.

10. The taxpayer purchased no shares of the stock of the corporation within sixty days prior or subsequent to the transfer of the 100,000 shares to Bockus or to Martin.

11. In his income-tax return for the year 1921, the taxpayer claimed a loss of $42,500 on the transfer to Bockus of the 100,000 shares of stock of the corporation and sought to take a deduction of that amount as a loss on such transfer on the ground that it was a sale. The Commissioner disallowed such deduction, asserted that the alleged sale was false and fictitious, determined a deficiency of $6,010.96, and added a fraud penalty of 50 per cent in the amount of $3,005.48.

12. The transfer to Bockus of the 100,000 shares of stock of the corporation and their subsequent transfer to Martin were made with intent to evade tax, and the return of the amount of $42,500 by the taxpayer as a loss resulting from a sale was false and fraudulent.

### OPINION.

TRAMMELL: The amounts paid for surveys of the Pearl City tract and the Waimalu Lands, as described in findings 1 and 2, are clearly capital expenditures and can not be deducted as ordinary and necessary business expenses. *Appeal of Consolidated Mutual Oil Co.*, 2 B. T. A. 1067.

The important question involved in this appeal is whether the taxpayer was guilty of fraud with intent to evade tax when he sought to deduct a loss of $42,500 on the purported sale of 100,000 shares of stock of the corporation. The taxpayer admitted that his sole purpose in transferring this stock was to write off a loss from his income for 1921. Whether he is entitled to deduct the loss depends on whether the transaction between him and Bockus on December 15, 1921, was a sale. If it was, the deduction was proper; if it was not, the deduction can not be allowed.

The Commissioner denies that the transaction between the taxpayer and Bockus was a sale and asserts that it was a mere pretense. The taxpayer declared that he sold the stock to Bockus, and that subsequently, at his request, Bockus sold the stock to Martin. Bockus in his testimony corroborates the taxpayer. However, the accompanying details and circumstances must be considered in interpreting the purpose and intent of the transaction with respect to the taxing law.

Stripped to bare essentials, the history of the taxpayer's deals with Bockus and Martin is as follows: The taxpayer, who was the owner of a large number of shares of stock of the corporation, agreed to " sell " 100,000 shares thereof to Bockus in return for a note or an I O U. When he discovered that Martin wanted the stock, the tax-

payer was so anxious that his bookkeeper should have it that he agreed to pay Bockus a broker's commission for destroying his note or I O U and accepted Martin's note in its place. This second note was allowed to repose in the office safe where Martin had ready access to it. Later on, and after the taxpayer had filed his income-tax return with the $42,500 deducted as a loss therein, Martin decided that he did not want to pay an assessment on the stock. The taxpayer with apparent willingness, and without any apparent consideration of the fact that the sale of the stock by the corporation to satisfy the assessment would be Martin's loss and not his, permitted Martin to take the note from the safe and destroy it, accepted return of the stock certificate, and paid the assessment to the company. The results of these transactions were that Bockus received a commission and was relieved of his obligation on the note, Martin was permitted to escape all liability on his note, and the taxpayer had his stock returned to him, paid an assessment thereon, and deducted a loss which, had it not been challenged by the Commissioner, would have enabled him to escape taxation for the year 1921.

The salient features of the transaction are not indicative of good faith therein. They do not indicate a sale which can be recognized under the revenue acts. The admitted intent to deduct a loss appears to be supported by a motive to take the loss without regard to the method employed. By a circuitous process the taxpayer sold the stock to himself for $250. This is a condition not dissimilar from, but more flagrant than, the condition developed in *Appeal of James Dobson*, 1 B. T. A. 1082.

On the evidence submitted in this appeal, we are not warranted in overturning the action of the Commissioner in denying the deduction. Nor can we, when confronted with such a peculiar situation, disturb the Commissioner's finding of fraud.

> *Judgment will be entered on 30 days' notice, under Rule 50.*

MILLIKEN did not participate.

MURDOCK dissents.

PHILLIPS, dissenting: While the transactions recited above are not free of suspicion, I have reached the conclusion, after hearing and weighing the testimony of the witnesses and considering the circumstantial evidence, that the record in this appeal, which is one step in the proceedings to impose a penalty for a criminal act, is insufficient to meet the requirement of the common law that commission of the crime must be established beyond a reasonable doubt.

The transactions, on their face, were regular. The testimony of the parties is that a sale was made and that there was no collateral agreement or secret understanding with respect to the stock. The

sales price represented the fair market value of the stock and there is nothing to indicate that Bockus and Martin were unable to meet their notes. In fact, the testimony indicates the contrary. The exaction by Bockus of a commission as a condition of the sale to Martin would not seem unusual if, as taxpayer contends, Bockus was then the owner of the stock, nor are the facts with reference to the subsequent re-acquisition of this stock unusual.

I am unwilling to adjudge this taxpayer guilty of the crime charged on suspicion alone, when the suspicious circumstances in the record are susceptible of an innocent interpretation, and for that reason I must dissent from the conclusion reached.

TRUSSELL concurs in this dissent.